D. EDWARD HAYS, #162507
ehays@marshackhays.com
CHAD V. HAES, #267221
chaes@marshackhays.com
MARSHACK HAYS LLP
870 Roosevelt
Irvine, California 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Chapter 7 Trustee,
DAVID M. GOODRICH

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>BENJAMIN W. GONZALES,<br><br>       Debtor. | Case No. 2:17-bk-23812-BR<br><br>Chapter 7<br><br>TRUSTEE'S MOTION TO APPROVE CARVE-OUT AGREEMENT AND COMPROMISE BETWEEN TRUSTEE AND BANK OF AMERICA; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID M. GOODRICH IN SUPPORT<br><br>Date:  December 18, 2018<br>Time:_ 2:00 p.m.<br>Ctrm:  1668 |

TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY COURT JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR, AND ALL INTERESTED PARTIES:

David M. Goodrich, in his capacity as Chapter 7 Trustee ("Trustee") for the bankruptcy estate ("Estate") of Benjamin W. Gonzales ("Debtor") respectfully files this motion seeking approval of a carve-out agreement and compromise ("Motion") with Bank of America, N.A. ("BofA"). BofA holds liens against property of the Estate. Under the terms of the agreement, BofA is carving-out funds for the benefit of creditors. The Trustee continues to negotiate additional carve-outs with lower priority lienholders.

MOTION TO APPROVE COMPROMISE/CARVE OUT WITH BANK OF AMERICA
4814-4631-8710v1/1239-013

1. **Summary of Proposed Agreement**

   A. **Bank of America**

   Trustee and Bank of America ("BofA") have jointly executed an agreement by which a $100,000 portion of BofA's liens, which comprise approximately $1,200,000 of secured debt on the Mar Vista Property (defined below), shall be carved-out for the benefit of creditors ("Agreement"). Additionally, BofA has agreed to pay the 6% broker commission and all standard costs of sale related to the sale of the Mar Vista Property which is estimated to total an additional approximate $160,000. From the net sales proceeds of the Mar Vista Property, after payment of costs and commissions, $100,000 will be paid to the Trustee with the remainder of the funds subject to BofA's liens to be paid directly to BofA. In exchange, the Trustee is releasing all claims of the Estate, creditors, and other parties as to BofA's proof of claim.

2. **Summary of Argument**

   Carve-outs should be approved if there is benefit to the estate. In this case, the Trustee has negotiated a carve-out agreement with the first-priority lienholder on over-encumbered real property. If approved, the projected $160,000 in costs of sale of the Mar Vista Property including commissions will be paid, and an additional $100,000 will be paid to the Estate by BofA. For the reasons set forth below, the Trustee believes that the approximate $160,000 in carve-out funds will provide a significant benefit to the Estate and should be approved, particularly when considered with additional carve-outs the Trustee is currently finalizing.

3. **Factual Background**

   On November 8, 2017, Debtor filed a voluntary petition under Chapter 7 of Title 11 of the United States Code in the Central District of California, commencing Bankruptcy Case No. 2:17-bk-23812-BR. David M. Goodrich, was appointed the Chapter 7 Trustee of the Estate.

   In his Schedule A/B, Debtor lists an ownership interest in 14930 Mar Vista St. Whittier, California 90605 ("Mar Vista Property"), with a scheduled value of $1,900,000.

   On January 25, 2013, Debtor and his then spouse, Ms. Gretel Gonzales ("Ms. Gonzales") signed a deed of trust ("First DoT") creating a lien against the Mar Vista Property in the amount of $550,750.00

   ///

MOTION TO APPROVE COMPROMISE/CARVE OUT WITH BANK OF AMERICA
4814-4631-8710v1/1239-013

1  in favor of BofA. On January 31, 2013, BofA recorded the First DoT at the Los Angeles County

2  Recorder's Office as instrument no. 13-162626.[2]

3         On November 5, 2013, Debtor and Ms. Gonzales signed a second deed of trust ("Second DoT")

4  creating a lien against the Mar Vista Property in the amount of $719,500.00 in favor of BofA. On

5  November 19, 2013, BofA recorded the Second DoT at the Los Angeles County Recorder's Office as

6  instrument no. 13-1640892.[3]

7         To date, the collective approximate amount owed to BofA that is secured by the First DoT and

8  Second DoT is $1,200,000 ("BofA Claim")

9         The Trustee seeks to sell the Properties for the benefit of creditors of the Estate. To that end,

10  the Trustee has negotiated a $100,000 carve-out from BofA, the first and second priority lienholder on

11  the Mar Vista Property. Pursuant to the Agreement, BofA has also agreed to pay the 6% broker

12  commission and all standard costs of sale, including title and escrow fees, related to the sale of the Mar

13  Vista Property.

14         The Trustee believes the fair market value of the Mar Vista Property is approximately

15  $1,800,000.

16         The Trustee is currently finalizing one or more additional carve-out agreements with lower

17  priority lienholders ("Non-BofA Carveouts") that will net the Estate between $100,000 and $200,000

18  in unencumbered funds in addition to the $100,000 from BofA. The Trustee anticipates filing a motion

19  for approval of the Non-BofA Carveouts within one week of this filing.

20         To ensure that the Estate receives funds from sales of the Mar Vista Property, the Parties enter

21  into this settlement providing for a carve-out and assignment to the Estate of funds otherwise subject

22  to the BofA Claim.

23  ///

24  ///

25  ///

26

27

---

28  [2] A true and correct copy of the First DoT is attached as **Exhibit 1**.
[3] A true and correct copy of the First DoT is attached as **Exhibit 2**.

MOTION TO APPROVE COMPROMISE/CARVE OUT WITH BANK OF AMERICA

4814-4631-8710v1/1239-013

## 4.    Details of the Compromises

### A.    BofA Agreement

The following is a brief summary of the terms set forth in the Agreement between the Trustee and BofA. The Trustee and BofA are collectively referred to as the "Parties."[4] Subject to Bankruptcy Court approval, the Parties agree as follows:

    a.    The carve-out is only for the benefit of allowed administrative claims and unsecured creditors of the Estate; and

    b.    BofA agrees to a $100,000 carve-out for the benefit of creditors of the Estate.

    3.    <u>Allowance of the BofA Claim</u>. For purposes of this Agreement, the BofA Claim shall be deemed allowed and the resulting Liens deemed valid. The Trustee waives and releases all claims of the Estate, creditors, and other parties to object to the BofA Claim and the resulting Liens.

    4.    <u>Payment from Escrow</u>: The Parties shall provide a copy of this Agreement to the escrow company assisting with the sale of the Mar Vista Property and shall instruct escrow to pay from the sale proceeds otherwise subject to BofA's liens, the 6% broker commission to the real estate agents involved in the sale, all standard costs of sale including title and escrow fees, and the sum of $100,000 to the Trustee. The remaining funds otherwise subject to BofA's liens shall be paid by escrow directly to BofA.

The Trustee seeks approval of the settlement set forth in the Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure ("FRBP").

## 5.    Legal Authority

### A.    The proposed Agreement will enable the Property to be sold for the benefit of creditors.

"[T]he sale of a fully encumbered asset is generally prohibited." *In re KVN Corp.*, 514 B.R. 1, 5 (B.A.P. 9th Cir. 2014). However, such a sale may nevertheless be justified through a negotiated carve-out agreement with the secured creditor. *Id.* at 6.

In determining whether to approve a sale subject to a carve-out agreement, the trustee must present evidence addressing the following questions: "Has the trustee fulfilled his or her basic duties? Is there a benefit to the estate; i.e. prospects for a meaningful distribution to unsecured creditors? Have the terms of the carve-out agreement been fully disclosed to the bankruptcy court?" *KVN Corp*,

---

4 All interested parties are advised to consult the Agreement for all terms and conditions. A true and correct copy of the Agreement is attached as **Exhibit 3**. The description of the settlement terms are a summary only.

1    514 B.R. at 8. If the answer to these questions demonstrates that the estate will be benefitted, then the

2    proposed carve-out can be approved. While the Trustee is not requesting approval of a sale at this time,

3    the reality remains that the Properties cannot be sold absent approval of the carve-outs.

4    ### i.        Has the Trustee fulfilled his basic duties?

5    The Trustee has a duty to administer the assets of the estate for the benefit of creditors.

6    11 U.S.C. § 704. In negotiating and obtaining the proposed carve-out, the Trustee was able to obtain the

7    BofA's agreement to have otherwise encumbered sales proceeds be used to cover commissions, costs

8    of sale, and provide $100,000 for the benefit of the Estate. By obtaining the Agreement, the Trustee has

9    done all that is possible to ensure that a sale of the Mar Vista Property can provide benefit to creditors.

10   ### ii.        Is there a benefit to the Estate?

11   Benefit to the estate is typically measured by a "meaningful distribution to unsecured claims."

12   *In re Scoggins*, 517 B.R. 206, 222 (Bankr. E.D. Cal. 2014). For example, there is a meaningful

13   distribution to unsecured claims if the distribution to be made is greater than the trustee's fees. *Id.* at

14   223.

15   In this case, Trustee estimates that his statutory fee for the sale of the Mar Vista Property will be

16   approximately $77,000. The attorneys' fees incurred by the Estate negotiating and documenting the

17   Agreement and in seeking court approval are not substantial – the BofA carveout was negotiated

18   primarily by BK Global Real Estate Services ("BK Global").[5] The benefit to the Estate from the instant

19   carveout (approximately $23,000), along with the projected benefit from the Non-BofA Carveouts

20   (between $100,000 and $200,000), will result in a substantial influx of unencumbered funds for the

21   benefit of creditors. As such, the carve-out will benefit unsecured creditors and not just administrative

22   creditors.

23   / / /

24   / / /

25   / / /

26

27

28

---

[5] BK Global assisted the Trustee to negotiate and procure the proposed carveout with BofA. The Trustee's application to retain BK Global and Keller Williams Downey to procure consented public sale of the Mar Vista Property is filed concurrently herewith.

MOTION TO APPROVE COMPROMISE/CARVE OUT WITH BANK OF AMERICA

4814-4631-8710v1/1239-013

### iii.    Have the terms of the Agreement been fully disclosed to the Court?

The written agreement memorializing the carve-out between the Trustee and BofA is attached as **Exhibits 3** to this Motion. Thus, the terms of the Agreement have been fully disclosed to the Court.

### B.    The Court may approve settlements of Estate claims.

The Court has the authority to decide whether to approve a settlement of claims held by and/or asserted against a bankruptcy estate. Notice must be given to all creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct. *See* Rule 9019(a) of the Federal Rules of Bankruptcy Procedure.

It is well-established that a compromise should be approved if it is "in the best interest of the estate … and is fair and equitable for the creditors." *Schmitt v. Ulrich (In re Schmitt)*, 215 B.R. 417, 424 (9th Cir. BAP 1997); *ATKN Company v. Guy F. Atkinson Company of California (In re Guy F. Atkinson Company)*, 242 B.R 497, 502 (9th Cir. BAP 1999) ("At its base, the approval of a settlement turns on the question of whether the compromise is in the best interest of the estate.")

The standards to be applied to the approval of a settlement include:

1.    the probability of success of the litigation on its merits;

2.    the difficulties in collection on a judgment;

3.    the complexity of the litigation involved; and

4.    the expense, inconvenience or delay occasioned by the litigation, and the interest of creditors.

*In re A & C Properties*, 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. den., *Martin v. Robinson*, 479 U.S. 854, 107 S.Ct. 189 (1989).

Although the Court is to consider the range of results in the litigation, "the court's assessment does not require resolution of the issues, but only their identification, so that the ***reasonableness*** of the settlement may be evaluated" (emphasis added). *In re Hermitage Inn, Inc.*, 66 Bankr. 71, 72 (Bankr. D. Colo. 1986). Moreover, it is ***not*** the bankruptcy court's responsibility to decide the numerous questions of law and fact with respect to the merits of the litigation, but rather to "canvass the issues

/ / /

MOTION TO APPROVE COMPROMISE/CARVE OUT WITH BANK OF AMERICA
4814-4631-8710v1/1239-013

and see whether the settlement falls below the lowest point of the range of reasonableness." *In re Heissinger Resources Ltd.,* 67 Bankr. 378, 383 (C.D. Ill. 1986).

### i.    The probability of success.

The Trustee is waiving any rights to challenge any portion of BofA's secured claim. The Trustee has investigated BofA's secured claim, and has concluded that litigation to determine the extent and/or validity of the secured claim is costly, highly speculative, and uncertain. In entering into an agreement with BofA, Trustee will avoid the expense of litigating an uncertain claim, thus guaranteeing recovery for creditors.

### ii.    Difficulties in Collection

If Trustee were to prevail in litigation reducing or limiting the BofA lien, there would be little difficulty in "collecting" such a judgment. However, the real difficulty lies in prevailing in such litigation, as explained above. As such, Trustee believes that approval of the compromises is in the best interest of the Estate.

### iii.    Complexity of Litigation

Should litigation be necessary to avoid any portion of the BofA lien, the Trustee believes that the legal issues will be complex, will require substantial time and expense, and will unreasonably delay administration of the case when weighed against the potential benefit. As such, the Trustee believes litigation to determine what portion of the BofA lien may be subject to challenge or avoidance is not in the interest of the Estate.

### iv.    Expense, Inconvenience, and Delay

Absent approval of the Agreement, unsecured creditors will not receive any recovery from the sale of the Mar Vista Property and the sale will likely be conducted outside of bankruptcy. If Trustee pursues litigation to avoid or reduce BofA's liens on the Properties, he anticipates that the cost of such litigation may exceed the potential recovery. Moreover, it will cause unnecessary inconvenience and delay in the administration of the Estate and the sale of the Mar Vista Property. In Trustee's role as a fiduciary of the Estate, he has determined that approval of the carve-out will realistically offer the best potential result for unsecured creditors.

///

### C.    The Carve-Out is fair and equitable and should be approved.

The Trustee believes that the Agreement is fair and equitable and in the best interest of the Estate for the following reasons:

1.    The Agreement resolves issues, thereby reducing litigation expenses;

2.    The Agreement avoids the risk of an unfavorable outcomes and no benefit to the Estate from the Mar Vista Property;

3.    Resolving this dispute in the proposed manner will result in the Estate maximizing limited resources for the benefit of creditors by avoiding unnecessary litigation costs; and

4.    Providing a recovery for unsecured creditors where there would otherwise be none.

The Trustee has therefore determined, in his sound business judgment, the proposed Agreement falls well within the range of reasonableness and should be approved by the Court.

## 6.    Conclusion

Based on the foregoing, the Trustee respectfully requests an order be entered:

1.    Granting the Motion;

2.    Authorizing the Trustee to take steps necessary to enter into and consummate the Agreement; and

3.    For such further relief as the Court deems just and proper.

Dated: November 20, 2018                    MARSHACK HAYS LLP


                                By: _/s/ Chad V. Haes_____
                                    D. EDWARD HAYS
                                    CHAD V. HAES
                                    Attorneys for Chapter 7 Trustee,
                                    DAVID M. GOODRICH

MOTION TO APPROVE COMPROMISE/CARVE OUT WITH BANK OF AMERICA
4814-4631-8710v1/1239-013

### Declaration of David M. Goodrich

I, DAVID M. GOODRICH, declare and state as follows:

1.      I am the Chapter 7 trustee ("Trustee") for bankruptcy estate of Debtor Benjamin W. Gonzales ("Debtor"). Except as otherwise stated, I know each of the following facts from my own personal knowledge, and, if called to testify, I would and could testify competently with respect thereto. I make this Declaration in support of Motion to Approve Compromise Between Trustee and Bank of America ("Motion").

2.      On November 8, 2017, Debtor filed a voluntary petition for relief under Chapter 7 of the United States Code, commencing the instant bankruptcy case. I was appointed Chapter 7 trustee.

3.      On January 22, 2018, Debtor filed Amended Schedules and Statements ("Amended Schedules"). In his Amended Schedules A/B, Debtor asserts an ownership interest in, *inter alia*, real property commonly known as 14930 Mar Vista St., Whittier, CA ("Mar Vista Property").

4.      On January 25, 2013, Debtor and his then spouse, Ms. Gretel Gonzales ("Ms. Gonzales") signed a deed of trust ("First DoT") creating a lien against the Mar Vista Property in the amount of $550,750 in favor of BofA.

5.      On January 31, 2013, BofA recorded the First DoT at the Los Angeles County Recorder's Office as instrument no. 13-162626. A true and correct copy of the First DoT is attached as **Exhibit 1**.

6.      On November 5, 2013, Debtor and Ms. Gonzales signed a second deed of trust ("Second DoT") creating a lien against the Mar Vista Property in the amount of $719,500.00 in favor of BofA.

7.      On November 19, 2013, BofA recorded the Second DoT at the Los Angeles County Recorder's Office as instrument no. 13-1640892. A true and correct copy of the Second DoT is attached as **Exhibit 2**.

8.      To date, the collective approximate amount owed to BofA that is secured by the First DoT and Second DoT is $1,200,000 ("BofA Claim")

9.      I seek to sell the Mar Vista Property for the benefit of creditors of the Estate. To that end, with the assistance of my general counsel and BK Global Real Estate Services, I have negotiated a $100,000 carve-out from BofA, the first and second priority lienholder on the Mar Vista Property.

Pursuant to the agreed-upon carve-out ("Agreement"), BofA has also agreed to pay the 6% broker commission and all standard costs of sale, including title and escrow fees, related to the sale of the Mar Vista Property. A true and correct copy of the Agreement is attached as **Exhibit 3**.

10.     I believe the fair market value of the Mar Vista Property is approximately $1,800,000.

11.     To ensure that the Estate receives funds from sales of the Mar Vista Property, I entered into the Agreement providing for a carve-out and assignment to the Estate of funds otherwise subject to the BofA Claim.

12.     I seek to eliminate the need for costly and protracted administration of the bankruptcy case and believe the best interests of the Estate are served by the carve-out and compromise set forth in the Agreement. The cost of litigation associated with the extent and validity of BofA's secured claim could be substantial and would unnecessarily dilute any recovery obtained for the benefit of the Estate. Moreover, there is no certainty that the result from such efforts would be better than the Agreement achieved.

13.     In evaluating the Agreement, I have taken into account the probability of success of litigation, the complexity of the litigation involved and the expenses, inconvenience, and delay necessarily resulting from such litigation, as well as the interests of creditors of the Estate. I have determined that the fees and costs associated with further litigation would be extensive and could outweigh any additional benefit that the Estate might achieve.

14.     I have evaluated the Agreement and, in my business judgment and experience as a Trustee, I believe that the Agreement is fair and equitable and in the best interests of the Estate.

15.     The carve-out and release set forth in the Agreement is a sound business decision because it will avoid litigation and the possibility that the Estate does not recover any funds from the sale of the Mar Vista Property.

16.     For these reasons, it is my business judgment that the proposed carve-out is reasonable and represents a fair and equitable resolution of the various claims between the parties.

/ / /

/ / /

/ / /

1        17.    I seek the Court's approval of the Agreement.

2        I declare that the foregoing is true and correct under the penalty of perjury. Executed on

3    November 20, 2018, in Costa Mesa, California.

4

5                            DAVID M. GOODRICH

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

MOTION TO APPROVE COMPROMISE/CARVE OUT WITH BANK OF AMERICA

Exhibit "1"

 **This page is part of your document - DO NOT DISCARD**





**20130162626**



**Pages:**
**0018**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**01/31/13 AT 08:00AM**

| | |
|---|---|
| FEES: | 70.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 70.00 |



**L E A D S H E E T**



201301310990087

00007175964



004616913

**SEQ:**
**07**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

t33

LSI

Recording Requested By:

Return To:
**Bank of America, N.A.**
**1 Mortgage Way, Mount Laurel NJ 08054**



01/31/2013

*20130162626*

Prepared By:

**5201 Gate Parkway, Jacksonville, FL  32256**

APN: 8149-0030-005

#15317798

[Space Above This Line For Recording Data]

# DEED OF TRUST

## DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated     **January 25, 2013**
together with all Riders to this document.
**(B) "Borrower"** is

    Benjamin William Gonzales and Gretel Arend Gonzales,Individually and
    as Trustees of the Gonzales Family Trust dated July 26, 1999

Borrower's address is **14930 Mar Vista St, Whittier, CA 90605**
                                                            . Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is **Bank of America, N.A.**

Lender is a **Corporation**
organized and existing under the laws of **Delaware**

7104447227

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    **Form 3005  1/01**
Wolters Kluwer Financial Services
VMP ®-6(CA) (0711)
Page 1 of 16                            Initials

Exhibit "1"
Page 13

Lender's address is **5201 Gate Parkway, Jacksonville, FL  32256**

Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is  **First American Title**

**(E) "Note"** means the promissory note signed by Borrower and dated  **January 25, 2013**
The Note states that Borrower owes Lender
**Five Hundred Fifty Thousand Seven Hundred Fifty Dollars and Zero Cents**                Dollars
(U.S. **$550,750.00**                 ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than  **February 01, 2043**
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds  Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

7104447227
**CALIFORNIA**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
VMP ®-6(CA) (0711)                                                         Page 2 of 16                    Initials_____                 Form 3005   1/01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
**County**                    of                    **LOS ANGELES**                    :

[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

**See Attached Legal Description**

EXHIBIT "A"

Parcel ID Number:                                        which currently has the address of
**14930 Mar Vista St**                                                          [Street]
**WHITTIER**                          [City], California **90605**          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

7104447227

CALIFORNIA -Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3005    1/01
VMP ®-6(CA) (0711)                    Page 3 of 16                    Initials

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

7104447227
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                           Form 3005    1/01
VMP ®-6(CA) (0711)                                 Page 4 of 16                      Initials

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

7104447227
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®-6(CA) (0711)                            Page 5 of 16                    Form 3005   1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

7104447227
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®-6(CA) (0711)                      Page 6 of 16                    Initials                    Form 3005   1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

7104447227
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®-6(CA) (0711)                    Page 7 of 16                    Initials _____    Form 3005   1/01

Exhibit "1"
Page 19

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

7104447227
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                Form 3005   1/01
VMP ®-6(CA) (0711)                          Page 8 of 16                  Initials

*10*

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

7104447227
**CALIFORNIA** -Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    **Form 3005    1/01**
VMP ®-6(CA) (0711)                          Page 9 of 16                    Initials

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

7104447227
**CALIFORNIA**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
VMP ®-6(CA) (0711)                    Page 10 of 16                    Initials                    Form 3005   1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

7104447227
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3005  1/01
VMP ®-6(CA) (0711)                    Page 11 of 16                    Initials

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

7104447227
CALIFORNIA -Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    Form 3005   1/01
VMP ®-6(CA) (0711)                                    Page 12 of 16              Initials

14

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

7104447227
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                   Form 3005   1/01
VMP ®-6(CA) (0711)                              Page 13 of 16            Initials _____

*15*

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above. A copy of any Notice of Default and any Notice of Sale will be sent only to the address contained in this recorded request. If the Borrower's address changes, a new request must be recorded.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____                (Seal)
Benjamin W Gonzales                            -Borrower

_____                (Seal)
Benjamin William Gonzales, as Trustee of the Gonzales -Borrower
Family Trust  under Trust instrument dated
07/26/1999 for the benefit of Benjamin William Gonzales
and Gretel Arend Gonzales.

_____                (Seal)
Gretel Arend Gonzales                          -Borrower

_____                (Seal)
Gretel Arend Gonzales, as Trustee of the Gonzales -Borrower
Family Trust  under Trust instrument dated
07/26/1999, for the benefit of Benjamin William Gonzales
and Gretel Arend Gonzales.

7104447227
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3005   1/01
VMP ®-6(CA) (0711)                     Page 14 of 16

Exhibit "1"
Page 26

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above. A copy of any Notice of Default and any Notice of Sale will be sent only to the address contained in this recorded request. If the Borrower's address changes, a new request must be recorded.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____

_____ (Seal)    _____ (Seal)
                                         -Borrower                                          -Borrower

_____ (Seal)    _____ (Seal)
                                         -Borrower                                          -Borrower

7104447227
**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    Form 3005   1/01
VMP ®-6(CA) (0711)                          Page 15 of 16

State of California
County of  LOS ANGELES                    } ss.                                    17

On  January 25, 2013            before me,  *Sheila Lynn Carlson, Notary Public*
                                                                    , personally appeared
William
Benjamin W Gonzales        *+ Gretel Ann Gonzales*

                                                                                    , who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF
PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

                                        *Sheila Lynn Carlson*        (Seal)



SHEILA LYNN CARLSON
Commission # 1885838
Notary Public - California
Los Angeles County
My Comm. Expires Apr 15, 2014

7104447227
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3005   1/01
VMP ®-6(CA) (0711)                    Page 16 of 16            Initials

**Exhibit A**
**(Property Description)**



In the City of Whittier, County of Los Angeles, State of California:

The Northwesterly 135 feet of Lot 13 of Tract 11571, in the City of Whittier, as per map recorded in Book 243 Pages 27 to 29 inclusive of Maps in the Office of the County Recorder of said County.

Except therefrom the Southwesterly 185 feet measured along the Northwesterly line of said Lot.

Assessor's Parcel No:    8149-0030-005

Exhibit "2"



**This page is part of your document - DO NOT DISCARD**



## 20131640892



**Pages:**
**0012**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**11/19/13 AT 08:00AM**

| FEES: | 52.00 |
|---|---|
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 52.00 |



**L E A D S H E E T**



201311190200004

**00008564503**



005897632

**SEQ:**
**16**

DAR - Title Company (Hard Copy)

**THIS FORM IS NOT TO BE DUPLICATED**

t53



Recording Requested
by Equity Title

Recording Requested By:

When Recorded Mail To:
CCS Recording Team
450 Exchange, #200
Irvine, CA 92602

Prepared By:
, c/o PHH Mortgage, 5201
Gate Parkway, Jacksonville,
FL 32256

1393973
AW-8149-130-005

_____ State of California _____        _____ Space Above This Line For Recording Data _____

## DEED OF TRUST        Loan #: 7104982629
(With Future Advance Clause)

1.   **DATE AND PARTIES.** The date of this Deed of Trust (Security Instrument) is November 5, 2013
     _____. The parties and their addresses are:
     TRUSTOR: BENJAMIN WILLIAM GONZALES AND GRETEL AREND GONZALES,
                 INDIVIDUALLY AND AS TRUSTEES OF THE GONZALES
                 FAMILY TRUST DATED JULY 26. 1999

          14930 MAR VISTA ST WHITTIER, CA 90605
          ☐ If checked, refer to the attached Addendum incorporated herein, for additional Trustors, their
          signatures and acknowledgments.
     TRUSTEE:
          First American Title
          1 First American Way, Santa Ana, CA 92707
     LENDER:
          Bank of America, N.A.
          c/o PHH Mortgage, 5201 Gate Parkway Jacksonville, FL 32256

2.   **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is
     acknowledged, and to secure the Secured Debt (defined below) and Trustor's performance under this
     Security Instrument, Trustor irrevocably grants, conveys and sells to Trustee, in trust for the benefit of
     Lender, with power of sale, the following described property:
     See Attached

### SEE EXHIBIT "A" ATTACHED

_____

Security Instrument-Open-End-Consumer-CA                                    OOF-REDT-CA 12/12/2007
VMP ® Bankers Systems ™                                                     VMPC465(CA) (0712)
Wolters Kluwer Financial Services  ©1994, 2007        Initials _____        Page 1 of 10



The property is located in _____ **LOS ANGELES** _____ at 14930 **MAR VISTA**
(County)

**ST** _____ _____, __ _____ **WHITTIER** _____ ,
(Address)                          (City)

California __ **90605** ___
(ZIP Code)

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

**3.** **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ 719,500.00 _____ . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**4.** **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:

A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(Include items such as borrowers' names, note or contract amounts, interest rates (whether variable), maturity dates, etc.)*

As indicated in the home equity line agreement dated 11/05/2013, with a maturity date of 11/05/2043.

B. All future advances from Lender to Trustor or other future obligations of Trustor to Lender under any promissory note, contract or guaranty, or other evidence of debt executed by Trustor in favor of Lender after this Security Instrument if this Security Instrument is specifically referenced on the evidence of other debt. If more than one person signs this Security Instrument, each Trustor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Trustor, or any one or more Trustor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument.

C. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

D. Performance of every obligation in this Security Instrument (including any subsequent instrument amending this Security Instrument) and any instrument now or later evidencing or securing any indebtedness secured by this Security Instrument.

Security Instrument-Open-End-Consumer-CA
VMP ® Bankers Systems ™
Wolters Kluwer Financial Services  © 1994, 2007

OCP-REDT-CA 12/12/2007
VMPC465(CA) (0712)
Page 2 of 10
Initials

In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in Trustor's principal dwelling that is created by this Security Instrument.

5.  **DEED OF TRUST COVENANTS.** Trustor agrees that the covenants in this section are material obligations under the Secured Debt and this Security Instrument. If Trustor breaches any covenant in this section, Lender may refuse to make additional extensions of credit and reduce the credit limit. By not exercising either remedy on Trustor's breach, Lender does not waive Lender's right to later consider the event a breach if it happens again.

**Payments.** Trustor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

**Prior Security Interests.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Trustor agrees to make all payments when due and to perform or comply with all covenants. Trustor also agrees not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written approval.

**Claims Against Title.** Trustor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Trustor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Trustor's payment. Trustor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Trustor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Trustor may have against parties who supply labor or materials to maintain or improve the Property.

**Property Condition, Alterations and Inspection.** Trustor will keep the Property in good condition and make all repairs that are reasonably necessary. Trustor shall not commit or allow any waste, impairment, or deterioration of the Property. Trustor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Trustor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Trustor will notify Lender of all demands, proceedings, claims, and actions against Trustor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Trustor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Trustor will in no way rely on Lender's inspection.

**Authority to Perform.** If Trustor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Trustor appoints Lender as attorney in fact to sign Trustor's name or pay any amount necessary for performance. Lender's right to perform for Trustor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument.

Security Instrument-Open-End-Consumer-CA
VMP ® Bankers Systems™
Wolters Kluwer Financial Services  © 1994, 2007

OCP-REDT-CA  12/12/2007
VMPC465(CA) (0712)
Page 3 of 18

Exhibit "2"
Page 33

**Leaseholds; Condominiums; Planned Unit Developments.** Trustor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Trustor will perform all of Trustor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

**Condemnation.** Trustor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Trustor authorizes Lender to intervene in Trustor's name in any of the above described actions or claims. Trustor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**Insurance.** Trustor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Trustor subject to Lender's approval, which shall not be unreasonably withheld. If Trustor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Trustor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Trustor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Trustor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Trustor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Trustor. If the Property is acquired by Lender, Trustor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

**Financial Reports and Additional Documents.** Trustor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Trustor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Trustor's obligations under this Security Instrument and Lender's lien status on the Property.

6.    **WARRANTY OF TITLE.** Trustor warrants that Trustor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, convey and sell the Property to Trustee, in trust, with power of sale. Trustor also warrants that the Property is unencumbered, except for encumbrances of record.

Security Instrument-Open-End-Consumer-CA
VMP ® Bankers Systems ™
Wolters Kluwer Financial Services © 1994, 2007

OCP-REDT-CA 12/12/2007
VMPC465(CA) (0712)
Page 4 of 10

7.  **DUE ON SALE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

8.  **DEFAULT.** Trustor will be in default if any of the following occur:

    **Fraud.** Any Consumer Borrower engages in fraud or material misrepresentation in connection with the Secured Debt that is an open end home equity plan.

    **Payments.** Any Consumer Borrower on any Secured Debt that is an open end home equity plan fails to make a payment when due.

    **Property.** Any action or inaction by the Borrower or Trustor occurs that adversely affects the Property or Lender's rights in the Property. This includes, but is not limited to, the following: (a) Trustor fails to maintain required insurance on the Property; (b) Trustor transfers the Property; (c) Trustor commits waste or otherwise destructively uses or fails to maintain the Property such that the action or inaction adversely affects Lender's security; (d) Trustor fails to pay taxes on the Property or otherwise fails to act and thereby causes a lien to be filed against the Property that is senior to the lien of this Security Instrument; (e) a sole Trustor dies; (f) if more than one Trustor, any Trustor dies and Lender's security is adversely affected; (g) the Property is taken through eminent domain; (h) a judgment is filed against Trustor and subjects Trustor and the Property to action that adversely affects Lender's interest; or (i) a prior lienholder forecloses on the Property and as a result, Lender's interest is adversely affected.

    **Executive Officers.** Any Borrower is an executive officer of Lender or an affiliate and such Borrower becomes indebted to Lender or another lender in an aggregate amount greater than the amount permitted under federal laws and regulations.

9.  **REMEDIES ON DEFAULT.** In addition to any other remedy available under the terms of this Security Instrument, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Trustor is in default. In some instances, federal and state law will require Lender to provide Trustor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions.

    At the option of the Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. Lender shall be entitled to, without limitation, the power to sell the Property.

    If Lender elects to foreclose by exercise of the power of sale, Lender will declare the entire Secured Debts due and payable by delivering to Trustee this Security Instrument and any evidence of the Secured Debts, receipts and evidence of expenditures made and secured, as Trustee requires. When the legally prescribed time passes after Trustee or Lender duly records a notice of default, the Trustee, Lender or other person authorized to take the sale will give a notice of sale as required by law and will cause the

Security Instrument-Open-End-Consumer-CA
VMP ® Bankers Systems ™
Wolters Kluwer Financial Services © 1994, 2007

OCP-REDT-CA 12/12/2007
VMPC465(CA) (0712)
Page 5 of 18

Initials 

Exhibit "2"
Page 35

Property to be sold at the time and place fixed in the notice of sale. Lender may rescind any notice of default at any time before the Property's sale. Rescission will occur when Lender executes and records a notice of rescission that cancels any prior notice of default and any related acceleration of the Secured Debts. Lender's rescission will not waive any default then existing or subsequently occurring or preclude Lender exercising its remedies, including the power of sale, at another time.

The Property can be sold as a whole or in separate parcels and in any order that Trustee decides. The Property will be sold to the highest bidder for cash in lawful money of the United States, payable at sale time. The Property can be sold to anyone, including Trustor, Trustee or Lender. Trustee may postpone the sale of any part of the Property by public announcement at the time and place of this sale and afterwards at the time fixed by the preceding postponement. Upon any sale of the Property, Trustee will make and deliver a special or limited warranty deed that conveys the property sold to the purchaser or purchasers. Under this special or limited warranty deed, Trustee will covenant that Trustee has not caused or allowed a lien or an encumbrance to burden the Property and that Trustee will specially warrant and defend the Property's title to the purchaser or purchasers at the sale against all lawful claims and demand of all persons claiming by, through or under Trustee. The deed's recital of facts will be conclusive proof of the truthfulness of these facts.

The proceeds from the Property's sale will be applied to the sale expenses, Trustee's expenses, Lender's attorneys' fees due on Trustor's default, sums that Trustee or Lender paid for procuring a title search of the Property's title subsequent to the execution of this Security Instrument, all outstanding amounts due under this Security Instrument and the remainder to anyone legally entitled to the remaining amounts due.

The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Trustor's default, Lender does not waive Lender's right to later consider the event a default if it happens again.

10. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** If Trustor breaches any covenant in this Security Instrument, Trustor agrees to pay all expenses Lender incurs in performing such covenants (including but not limited to advances and expenses described in the DEED OF TRUST COVENANTS section) or protecting its security interest in the Property. Such expenses include, but are not limited to, fees incurred for inspecting, preserving, or otherwise protecting the Property and Lender's security interest. These expenses are payable on demand and will bear interest from the date of payment until paid in full at the highest rate of interest in effect as provided in the terms of the Secured Debt. Trustor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. To the extent permitted by the United States Bankruptcy Code, Trustor agrees to pay the reasonable attorneys' fees Lender incurs to collect the Secured Debt as awarded by any court exercising jurisdiction under the Bankruptcy Code. This Security Instrument shall remain in effect until released. Trustor agrees to pay for any recordation costs of such release.

Security Instrument-Open-End-Consumer-CA
VMP ® Bankers Systems ™
Wolters Kluwer Financial Services   © 1994, 2007

OCP-REDT-CA  12/12/2007
VMPC46S(CA) (0712)
Page 6 of 10

11. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

Trustor represents, warrants and agrees that:

   A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

   B. Except as previously disclosed and acknowledged in writing to Lender, Trustor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

   C. Trustor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Trustor shall take all necessary remedial action in accordance with any Environmental Law.

   D. Trustor shall immediately notify Lender in writing as soon as Trustor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

12. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Trustor will not be required to pay to Lender funds for taxes and insurance in escrow.

13. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Trustor signs this Security Instrument but does not sign an evidence of debt, Trustor does so only to mortgage Trustor's interest in the Property to secure payment of the Secured Debt and Trustor does not agree to be personally liable on the Secured Debt. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Trustor and Lender.

14. **SEVERABILITY; INTERPRETATION.** This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security

Security Instrument-Open-End-Consumer-CA
VMP ® Bankers Systems ™
Wolters Kluwer Financial Services  © 1994, 2007

OCP-REDT-CA  12/12/2007
VMPC465(CA) (0712)
Page 7 of 10
Initials

Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

15. **SUCCESSOR TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee without any other formality than the designation in writing. The successor trustee, without conveyance of the Property, shall succeed to all the title, power and duties conferred upon Trustee by this Security Instrument and applicable law.

16. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one trustor will be deemed to be notice to all trustors. Lender and Trustor request that copies of any notice of default or notice of sale under a superior security instrument be sent to Lender and Trustor at the addresses listed in the DATE AND PARTIES section.

17. **WAIVERS.** Except to the extent prohibited by law, Trustor waives all appraisement or marshalling of assets relating to the Property.

18. **SEPARATE PROPERTY.** Any Trustor who is a married person or a registered domestic partner expressly agrees that recourse may be had against his or her separate property.

19. **LINE OF CREDIT.** The Secured Debt includes a revolving line of credit. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

20. **APPLICABLE LAW.** This Security Instrument is governed by the laws as agreed to in the Secured Debt, except to the extent required by the laws of the jurisdiction where the Property is located, and applicable federal laws and regulations.

21. **RIDERS.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument. [Check all applicable boxes]
   ☐ Assignment of Leases and Rents   ☐ Other _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

22. ☐ **ADDITIONAL TERMS.**

Security Instrument-Open-End-Consumer-CA
VMP ® Bankers Systems ™
Wolters Kluwer Financial Services © 1994, 2007

OCP-REDT-CA 12/12/2007
VMPC465(CA) (0712)
Page 8 of 10
Initials

**23. REQUEST FOR NOTICE.** Borrower requests that copies of the notice of default and notice of sale be sent to Borrower's address which is the Property Address. Lender requests that copies of the notices of foreclosure from the holder of any lien which has priority over this Deed of Trust be sent to the Lender's address, as set forth on page one of the Deed of Trust, as provided by Section 2924 (b) of the Civil Code of California.

**SIGNATURES:** By signing below, Grantor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Grantor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

_____ (Signature)  11-5-13 11-5-13 (Date)

Benjamin William Gonzales, individually
and as Trustee of the Gonzales Family
Trust under trust instrument dated July
26, 1999, for the benefit of Benjamin
William Gonzales and Gretel Arend
Gonzales

_____ (Signature)  11/5/13 11/5/13 (Date)

Gretel Arend Gonzales, individually
and as Trustee of the Gonzales Family
Trust under trust instrument dated
July 26, 1999, for the benefit of
Benjamin William Gonzales and Gretel
Arend Gonzales

ACKNOWLEDGMENT:

STATE OF CA _____, COUNTY OF LOS ANGELES,_____}ss.
On _Nov 5, 2013_____ before me, _Sheila Lynn Carlson_____,
a notary public, personally appeared Benjamin William Gonzales, Gretel Arend
Gonzales _Benjamin William Gonzalez, Gretel Arend
Gonzalo_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.



Signature _Sheila Lynn Carlson_____
Name (typed or printed)

My commission expires: _____4-15-2014_____

SHEILA LYNN CARLSON
Commission # 1885838
Notary Public - California
Los Angeles County
My Comm. Expires Apr 15, 2014

---

**REQUEST FOR FULL RECONVEYANCE**

**To Trustee:** The undersigned is the holder of the note or notes secured by this Deed of Trust, which was
recorded in the office of the Recorder of LOS ANGELES _____ County, State of California,
in book _____, page _____ of official records. Said note or notes, together with all
other indebtedness secured by this Deed of Trust, have been paid in full. You are hereby directed to cancel
said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey, without warranty, all
the estate now held by you under this Deed of Trust to the person or persons legally entitled thereto.
Dated: _____

---

Assessor's Identification Number _____ - _____ - _____

---

Security Instrument-Open-End-Consumer-CA
VMP ® Bankers Systems ™
Wolters Kluwer Financial Services © 1994, 2007

OCP-REDT-CA 12/12/2007
VMPC465(CA) (0712)
Page 10 of 10

*12*

ORDER NO. OR1393973

## EXHIBIT "A"

THE NORTHWESTERLY 135 FEET OF LOT 13 OF TRACT 11571, IN THE CITY OF WHITTIER, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 243 PAGES 27 TO 29 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THE SOUTHWESTERLY 185 FEET MEASURED ALONG THE NORTHWESTERLY LINE OF SAID LOT.

***END OF LEGAL DESCRIPTION***

3

Exhibit "3"

.

## CARVE-OUT AGREEMENT

THIS CARVE-OUT AGREEMENT ("Agreement") is entered into on October__, 2018, ("Effective Date") by and between David M. Goodrich ("Trustee") solely in his capacity as Chapter 7 trustee for the bankruptcy estate of Benjamin W. Gonzales ("Debtor"), and secured creditor Bank of America ("BofA"). Trustee and BofA are collectively referred to as the "Parties."

## I. RECITALS

A.    On November 8, 2017, Debtor filed a voluntary petition under Chapter 7 of Title 11 of the United States Code in the Central District of California, commencing Bankruptcy Case No. 2:17-bk-23812-BR.

B.    In his Schedule A/B, Debtor lists an ownership interest in 14930 Mar Vista St. Whittier, California 90605 ("Mar Vista Property"), with a scheduled value of $1,900,000.

C.    On January 25, 2013, Debtor and Ms. Gonzales signed a deed of trust ("First DoT") creating a lien against the Mar Vista Property in the amount of $550,750.00 in favor of BofA. On January 31, 2013, BofA recorded the First DoT at the Los Angeles County Recorder's Office as instrument no. 13-162626.

D.    On November 5, 2013, Debtor and Ms. Gonzales signed a second deed of trust ("Second DoT") creating a lien against the Mar Vista Property in the amount of $719,500.00 in favor of BofA. On November 19, 2013, BofA recorded the Second DoT at the Los Angeles County Recorder's Office as instrument no. 13-1640892.

E.    To date, the collective approximate amount owed to BofA that is secured by the First DoT and Second DoT is $1,100,000 ("BofA Claim").

F.    The Trustee seeks to sell the Mar Vista Property for the benefit of creditors of the Estate. To that end, the Trustee has negotiated a $100,000 carve-out from BofA, the first and second priority lienholder on the Mar Vista Property. Pursuant to the agreed-upon carve-out, BofA has also agreed to pay the 6% broker commission and all standard costs of sale, including title and escrow fees, related to the sale of the Mar Vista Property.

G.    To ensure that the Estate receives funds from sales of the Properties, BofA agrees to carve out and assign to the Estate funds otherwise subject to BofA's Liens.

## II. SETTLEMENT TERMS

In consideration of the Recitals above and the mutual promises contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are acknowledged, the Parties agree, covenant, and represent as follows subject to approval by the Bankruptcy Court in Debtor's case:

1.    Incorporation of Recitals: The Parties incorporate the Recitals above as though fully set forth here, and the Recitals are made part of this Agreement.

2.    Carve-Out by BofA: BofA has agreed to a carve-out and assignment to the Estate of funds otherwise subject to its Liens as follows:

a.    The carve-out is only for the benefit of allowed administrative claims and unsecured creditors of the Estate; and

b.     BofA agrees to a $100,000 carve-out for the benefit of creditors of the Estate.

3.      Allowance of the BofA Claim. For purposes of this Agreement, the BofA Claim shall be deemed allowed and the resulting Liens deemed valid. The Trustee waives and releases all claims of the Estate, creditors, and other parties to object to the BofA Claim and the resulting Liens.

4.      Payment from Escrow: The Parties shall provide a copy of this Agreement to the escrow company assisting with the sale of the Mar Vista Property and shall instruct escrow to pay from the sale proceeds otherwise subject to BofA's liens, the 6% broker commission to the real estate agents involved in the sale, all standard costs of sale including title and escrow fees, and the sum of $100,000 to the Trustee. The remaining funds otherwise subject to BofA's liens shall be paid by escrow directly to BofA.

5.      Trustee's Capacity. The Trustee is signing this Agreement in his capacity solely as Chapter 7 trustee of the bankruptcy estate of Debtor. Nothing contained in this Agreement shall in any way impute liability to the Trustee, personally or as a member of any professional organization or anyone acting on his behalf.

6.      Admissions. If this Agreement fails to become effective for any reason or is otherwise not fully consummated, nothing in this Agreement shall bind the Parties or constitute an admission by the Parties.

7.      Authority. The signatories to this Agreement acknowledge that they have the authority and have obtained the requisite approval to enter this Agreement and to act on behalf of and bind any entity on whose behalf they are signing.

8.      Representation by Counsel. The Parties further represent that they have been represented by legal counsel or have had the opportunity to seek advice of legal counsel during the course of the negotiations leading to the signing of this Agreement and that they have been advised by legal counsel with respect to the meaning of this Agreement and its legal effect.

9.      No Partnership or Joint Venture: Nothing in this Agreement is intended to be construed as or to create a partnership or joint venture between the parties.

10.     Brokerage Commissions and Expenses of Sale: The Parties acknowledge that brokerage commissions and costs of sale are administrative expenses subject to allowance by the court and to be paid before distributions are made to unsecured creditors. However, BofA has agreed to pay all brokerage commissions and costs of sale related to the sale of the Mar Vista Property.

11.     Integration. This Agreement constitutes an integrated written contract expressing the entire agreement of the Parties. Other than this Agreement there is no other agreement, written or oral, express or implied, between the Parties with respect to this subject matter.

12.     Modification or Amendment. This Agreement cannot be orally modified or amended. This Agreement may be modified or amended only by a written agreement signed by all Parties.

13.     Counterparts. This Agreement may be executed in counter-parts, including facsimile and email signatures, with the same effect as if all original signatures were placed

4817-1437-9098, v. 3

on one document and all of which together shall be one and the same agreement.

14.    <u>Binding Agreement</u>. This Agreement is and shall be binding upon and shall inure to the benefit of the heirs, assigns, principals, and successors of all of the Parties.

15.    <u>Interpretive Law</u>. This Agreement is made and entered into in the State of California and shall, in all respects be interpreted, enforced, and governed by and under the laws of the State of California and the United States Bankruptcy Code as applied in the Ninth Circuit.

16.    <u>Ambiguities</u>. This Agreement has been reviewed by the Parties and their respective counsel. Further, the Parties have had full opportunity to negotiate the terms and conditions of this Agreement. Accordingly, the Parties expressly waive any common-law or statutory rule of construction that ambiguities should be construed against the drafter, and agree, covenant, and represent that the language in all parts of this Agreement shall be in all cases construed as a whole, according to its fair meaning.

17.    <u>Miscellaneous Provisions</u>.

a    The Parties represent that they have read this Agreement and fully understand all of its terms; that they have conferred with or had the opportunity to confer with their attorneys about this Agreement; that they have executed this Agreement without coercion or duress of any kind; and that they understand any rights that they have or may have and sign this Agreement with full knowledge of any such rights.

b.    The Parties acknowledge that, other than as expressly set forth in this Agreement, no representations, statements or promises made by the other Party, or by their respective agents or attorneys, have been relied on in entering into this Agreement.

c.    Each Party understands that the facts with respect to which this Agreement is entered into may be materially different from those the Parties now believe to be true. Each Party accepts and assumes this risk and agrees that this Agreement and the release in it shall remain in full force and effect and legally binding, notwithstanding the discovery or existence of any additional or different facts, or any claims with respect to those facts.

The undersigned have read the foregoing and accept and agree to the provisions contained herein, and hereby execute it, knowingly, voluntarily, and with full understanding of its consequences.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the dates indicated below.

Dated: ~~October~~ November 20, 2018

DAVID M. GOODRICH, Chapter 7 Trustee for the Bankruptcy Estate of Benjamin Gonzales

Dated: ~~October~~ November 2, 2018

Authorized Representative for Bank of America.
_____, its,
Senior Vice President

4817-1437-9098, v. 3

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620

A true and correct copy of the foregoing document entitled **TRUSTEE'S MOTION TO APPROVE CARVE-OUT AGREEMENT AND COMPROMISE BETWEEN TRUSTEE AND BANK OF AMERICA; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID M. GOODRICH IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 20, 2018,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On **November 20, 2018,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **November 20, 2018,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.
**VIA PERSONAL DELIVERY**
PRESIDING JUDGE'S COPY
Bankruptcy Judge Barry Russell
United States Bankruptcy Court, Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 20, 2018 | Chanel Mendoza | */s/ Chanel Mendoza* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

4843-2931-0080, v. 1

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
   - CREDITOR BMW BANK OF NORTH AMERICA, C/O AIS PORTFOLIO SERVICES, LP: Bhagwati Barot   bbarot@aissolution.com
   - CREDITOR COMERICA BANK: Jennifer Witherell Crastz    jcrastz@hrhlaw.com
   - CREDITOR COMERICA BANK: Christopher D Crowell    ccrowell@hrhlaw.com
   - INTERESTED PARTY: Howard M Ehrenberg    hehrenberg@sulmeyerlaw.com, hehrenberg@ecf.inforuptcy.com;mviramontes@ecf.inforuptcy.com
   - INTERESTED PARTY ANDY EPSTEIN: Andy J Epstein    taxcpaesq@gmail.com
   - TRUSTEE: David M Goodrich (TR)    dgoodrich@wgllp.com, c143@ecfcbis.com;dgoodrich11@ecf.epiqsystems.com;lrobles@wgllp.com
   - ATTORNEYS FOR TRUSTEE DAVID M. GOODRICH: Chad V Haes    chaes@marshackhays.com, 8649808420@filings.docketbird.com
   - ATTORNEYS FOR TRUSTEE DAVID M. GOODRICH: D Edward Hays    ehays@marshackhays.com, 8649808420@filings.docketbird.com
   - ATTORNEYS FOR TRUSTEE DAVID M. GOODRICH: Laila Masud    lmasud@marshackhays.com, 8649808420@filings.docketbird.com
   - DEBTOR BENJAMIN W. GONZALES: James R Selth    jim@wsrlaw.net, jselth@yahoo.com;brian@wsrlaw.net;vinnet@ecf.inforuptcy.com
   - INTERESTED PARTY: Valerie Smith    claims@recoverycorp.com
   - U.S. TRUSTEE: United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
   - DEBTOR BENJAMIN W. GONZALES: Daniel J Weintraub    dan@wsrlaw.net, vinnet@ecf.inforuptcy.com;brian@wsrlaw.net

2. **SERVED BY UNITED STATES MAIL**: CON'T

**DEBTOR**
Benjamin W Gonzales
P.O. Box 1530
Los Angeles, CA 90001-0530

**SETTLING PARTY**
Bank of America, N.A.
Attn: CEO, or Officer, Managing or General Agent, or any Other Agent Authorized to Receive Service of Process
818 West 7th Street, 2nd Floor
Los Angeles, CA 90017

**SETTLING PARTY**
Bank of America, N.A.
C T Corporation System
Attn: Janice Bergthold, Senior Vice President, or CEO, or Officer, Managing or General Agent, or any Other Agent Authorized to Receive Service of Process
150 N. College St., NC1-028-17-06
Charlotte, NC 28255

**INTERESTED PARTY**
Steven Shiller, Esq.
BK GLOBAL
1095 Broken Sound Pkwy., Suite 100
Boca Raton, FL 33487

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.